May it please the Court, I'm Mike Morris and I represent the plaintiff's element, MSM Investments Company, LLC. I'd like to start with a discussion of the issue relating to the implied covenant of good faith and fair dealing. Defendants Bailey and Vidod controlled Carolwood and were themselves party to the settlement agreement, which was that issue in this case, and it was the plaintiff's consistent position that as parties to the agreement, they owe an independent duty of good faith and fair dealing to the plaintiff. This is not the same thing as saying that Bailey and Vidod personally guaranteed the performance of Carolwood. We've never taken that position. Wait just a moment. I think we're getting some feedback. These tapes do that whenever there's a patent infringement, they just go. Memorax just jumps in there. Wait just a minute. Is that counting against my time? No, we're going to start all, I'm going to let you start all over. Okay, thank you. So don't worry about it. Okay, we just start all over on the clock too and we'll just pretend like you just showed up this very moment. It's all yours. Thank you, Your Honor. You may want to announce your appearance again. Okay. Again, may it please the court. I'm Mike Morris representing the Pellant MSM Investments Company LLC. Relating to the issue of good faith and fair dealing, defendants Bailey and Vidod controlled defendant Carolwood and were themselves party to the settlement agreement. It is plaintiff's position that as parties to the agreement, Bailey and Vidod themselves owed an independent duty of good faith and fair dealing to the plaintiff. As I was saying, this is not the same as saying that those defendants personally guaranteed Carolwood's performance. For example, if Carolwood could not perform its agreement because its business failed or it became insolvent through no fault of Bailey and Vidod, the plaintiff would have no claim against defendants Bailey and Vidod. Rather, the plaintiff's claim here is that Bailey and Vidod exercised their control to cause Carolwood to breach its contract. It is not an extension of Oregon law to apply the duty of good faith and fair dealing in this case. It is just a natural application of well settled, well stated Oregon law. Oregon law makes clear that parties to a contract have a duty not to take any action which would deprive the other party of the fruits of the contract. Here, Bailey had a duty of good faith but used his control to cause Carolwood to stop paying royalties. And he frankly admitted that he wanted to renegotiate this contract. So he simply stopped paying the royalties to bring this to a crisis. In the meantime, Carolwood continued to enjoy the benefits of the license. They were selling products under the license and Bailey continued to receive his owner's share of the profits. Now, although the general principles should apply here without question, the closest authority I was able to find when I was preparing the brief was the Swenson case. And I frankly admitted that the case could not be stated to be on all fours. However, in preparing for oral argument this morning, over the weekend, and I tried to update my research, I discovered that in the last couple of months the Oregon Court of Appeals has decided a case which is on all fours and which is absolutely controlling the issue that I've raised on this appeal. And I've asked the clerk to supply copies to the court of the case of Pollack v. D.R. Horton, Incorporated, Portland, 190 Oregon Appellate 177 Pacific 3rd, 1120. And I'm sorry for bringing this to the court's attention so late. I would like to file a memorandum of supplemental authorities. But I would like to also – We will advise you if we want that. Okay. Thank you. Counsel, your opposing counsel, has a copy. I did supply a copy. Again, he's only had an hour to look at it himself. I understand, but at least he has it. Yes. So I'd like to just go through briefly this case to explain why it is controlling this issue. In the Pollack case, the plaintiff, Mr. Pollack, built new homes through his company, RMP. He sold the RMP business through an asset purchase agreement. The defendant, Horton, agreed to set up a subsidiary corporation, Horton, Portland, HP, to purchase the asset. And both Horton and its subsidiary then were parties to the asset purchase agreement. Because the business was worth more than the sales price, Pollack stayed on as manager of HP and had the right to what they called an earn-out based on profits in excess of a certain amount. And a section of the contract, 9.06, recognized that the earn-out created a good-faith obligation for Horton Pacific, HP, to provide substantial financing for the business so that he could then sell more homes and make more profit and then earn more money. Thereafter, Horton, the parent corporation, directed Horton, Portland, the subsidiary, to limit HP's inventory of unsold housing starts to 150 housing starts. And then Pollack contended that this limitation made it impossible for Horton Pacific to earn sufficient profits for Pollack to receive anything under the earn-out. So some complicated facts, but it really boils down to simple claim that the parent corporation took action, limiting the subsidiary's number of houses they were going to build, which consequently meant that Mr. Horton could not receive the fruits of his contract to earn this earn-out. Pollack sued both Horton and Horton Pacific. He sued Horton Pacific for breach of contract, including the expressed good-faith obligation under paragraph 9.06. They also argued that Horton directly violated its own implied good-faith obligation when it made the decision to limit the subsidiary's inventory of housing starts. And the Oregon Court of Appeals held, and this is at page 10 of the decision, that Horton is a party to the asset purchase agreement and have an implied duty to perform in good faith, even though it is not subject to the expressed good-faith obligation of section 9.06. Horton was fully aware of all of the circumstances that we previously described, and the jury could find that by its decision to impose the limitation, it breached its implied obligation to perform the asset purchase agreement in good faith. Horton is the parent or the sub? Horton is the parent. It's a corporation. They're both corporations. And in this situation, we have officers, correct? We have both. We have the corporation and we have the officers, Bailey and Vidot. Vidot is the parent of Carowood, and then Bailey owns Vidot. And Bailey controls all the corporations. He admitted that everything was his decision. So I think this case is completely analogous. It's on all fours, and it is saying that because Horton itself was a party to this agreement, it has its own duty of good faith. Can I boil that down just a little bit to make sure I'm following? You're saying that even though Oregon law recognized that a corporate officer can direct his corporate entity, his corporate employer, to breach a contract to which the corporation is a party, but he is not in your construct, that the corporate CEO, officer, does not have an obligation of good faith and fair dealing, it would get messed up with the laws on intentional interference with contract and the like. Okay. So what you're saying that distinguishes and takes this case out from that paradigm is that because the corporate officer is, in fact, a party to the underlying contract, albeit not making the same promises as the corporation, he, therefore, has a duty arising directly from the contract as a party to it. Yes, Your Honor. And that that's on all fours with Horton's status in this new case. Yes, Your Honor. That's exactly it. Horton, in this case, the only thing they promised that I could see is they promised to set up a subsidiary corporation to buy the assets, and yet they were a party to the contract, and that was enough for the Oregon Court of Appeals to say they themselves then have a duty of good faith and fair dealing and cannot cause their subsidiary then to breach their contract. So if let's say there were two contracts instead of a single document, and one is the corporate and one is the individual, and they were both the settlement agreement that we have in your case, so the settlement terms were set out in one vis-à-vis the corporation, the other versus the individual because they're different here, would you then still be able to hold the corporate officer liable for this alleged good faith breach? I think it would depend on whether the court would consider the two contracts as one overall contract. And, in fact, even in the Horton case, there was a side employment agreement, and they said it was still part of the overall picture, the earn out and everything from the employment agreement. So I think if the two contracts were done together as part of one overall settlement of that litigation, the fact they split it into two separate contracts I don't think would have mattered. But, again, that's a hypothetical question because, in this case, it was in one contract. I also think that the Horton case makes clear that the argument put forth by the defendant is not correct. The defendants were saying that the good faith doctrine has to somehow be tied to the express obligations of the contract, and here we have a clear situation where it is not. All Horton agreed to do was set up a subsidiary corporation, and yet months later, when it took this action, well after it formed that corporation, its duty of good faith continued even beyond the action it was required to take. I would like to discuss the second issue. That's what I was going to say about that issue, and I realize that this case is coming in. I'm sorry, it's just one of those fortuitous things. This case was decided just a few months ago. But I would like to spend some time talking about the other issue, which is, where's the evidence in the main agreement that the annual $200,000 payments are in consideration, other than for an ongoing operation or business venture, which, in fact, your client elected to terminate? The $200,000 payments were going to be due whether Carroll would have sold any product or not. Their royalties were based on sales, a percentage of sales. The $200,000 were really $600,000 split into three annual payments. It was the consideration for entering into the contract in the first place. But we have to derive that from the language, I gather, because that's not precisely what it says. What it says is it lays out a schedule of payments, which I grant reasonably could be construed as to be a flat fee. But what's the fee for? It could be a fee for having the essentially exclusive license. As I read it, it's technically a non-exclusive license, but all that you can do is license other alleged infringers, as I understand it. So you reserve the option to sort of settle out with them in the same fashion as Carroll would. So in any event, they get something in the universe of their activities for having this license, whether they sell anything or not. But once you've cut off the license by terminating it, what have they got? Well, it was a non-exclusive license, first of all. So therefore, it wasn't a blanket non-exclusive license. Right. So therefore, they have a right to sell product under the license and then pay a royalty. But you cut that off when you terminated it. Yes, but the $200,000 payment is part of the expectation of the contract, whether they sell product or not. So why don't you just leave it in place then? And let them keep still selling product and competing with our legitimate licensee. It seems to me it doesn't matter what you call it. It tells you when the $200,000 is due or not due. And whether it's ongoing relationship or implicit addition to royalties or consideration for the settlement, you now have a brand new contract here and you read paragraph 10 and then you read paragraph 12G.  Well, 12G makes a clear distinction between the royalty payments and the contract payments. And once Terrell is in material breach for failing to pay royalties and, in fact, saying they won't pay any more royalties, the plaintiff is entitled to the expectation damages it would receive under that contract. That's true if you don't terminate the contract. But you've terminated the contract, which then says you've elected. I mean, you can talk me out of it, but that seems to be what the black letter law is, that the non-breaching party has the obligation to treat the contract as continuing in existence and sue for damages. Right? No, I don't believe that's the black letter law. I think the black letter law is you can, yes, you can terminate the contract. But by terminating the contract, you do not waive your right to sue for the damages you would have received had the contract been performed. You're not required to keep the contract in place while the other side is in material breach. The non-breaching party can terminate the contract without waiving its right to damages, future damages. Okay, so how would this work? What would you sue for under the royalties? You had an expectation that they would sell based on their prior performance on the two years that they did perform. You could go ahead and sue for those royalties? Yes, theoretically, I could have also added a claim for the royalty income that we expected under that contract. But the reasons I stated in my brief, we wanted to get someone judged. This case had gone on over a year without any royalty payments. And the small amount that we would have claimed there would have meant we'd have to go to a trial and prove the amount. So we made a decision not to ask for those damages, just the $200,000 payment. But, yes, we could have also asked for the expectation of royalties under that contract for the rest of it. We just chose not to. What's the best case you have for establishing, you set the royalties aside, that if the $200,000 payment was an annual payment for having the license, that once you terminated and in face of their breach, once you terminated it, you could continue to get the fee for their having had the license? I've cited, I think, two important cases in the brief. One is the McEwen case. I don't know if I'm saying it right. It's an Oregon decision. And the other is the Anvil Mining case, an old United States Supreme Court decision, which is saying that terminating the contract is not technically, it's an acceptance of the situation, but it does not mean that the plaintiff cannot get the damages it would have received. I believe that's the law of expectation damages under contract law. If I may, I'd like to reserve just a few minutes. You may. Thank you. Thank you, Your Honors. David Hammond here for the appellee, Hillwood Corporation, G. Rex Bailey, and Vita Enterprises. I think I'll start with the first issue that Mr. Morris addressed, which is the good faith and fair dealing issue. Oregon law is clear that the good faith and fair dealing implied duty that is created under Oregon law is limited to the objectively reasonable expectation of parties. We do not dispute that Mr. Bailey and Vita Enterprises had such a duty, because every contracting party does. The question is, what's the scope of that duty? And if you look at the cases from the Oregon Supreme Court, they're clear. You have to look at the express obligations that the party undertakes in the agreement in defining how broadly that implied duty extends. So the key thing to do here to begin is to look at, what did each of the parties agree to do when they signed the settlement agreement? Well, they certainly entered into an agreement that called for three years of performance, and they certainly didn't expect that within shortly after a year of performance that your client would set about to breach it. Well, it depends on what obligations we're talking about, Your Honor, because the obligations that Carolwood undertook, there was a breach as determined by the trial court here, the district court. But there's no allegation that Mr. Bailey or Vita Enterprises breached any of their express obligations. But they caused them to breach. So but for the Oregon law, which seems to say, I'm no expert in Oregon law, but for my colleague on the far right who knows much more about it than I, but just at least at this stage of my analysis, it does seem that if the corporate executives of a corporation decide having signed on to an agreement and then turn around within a year and in acting in that same capacity, because they signed on behalf of the corporation, right? Well, The signatures are there. They signed it. I understand. They're separate, but they also exercised their authority to cause the corporation to enter into the settlement agreement. Agreed? Certainly. As a corporate officer, Mr. Bailey signed in the capacity as a corporate officer. I understand. As corporate officers, wearing two hats, individual and corporate officer. Okay. He signs the agreement. But now he, in that same capacity as corporate officer, decides that the corporate entity should breach, and let's make it even more argumentative, blatantly breach the agreement. Okay? And you're saying that the reasonable expectations of the parties at the time of the agreement were that he could very well do that. That was exactly what it was all about. Well, again, Your Honor, I think it's important here that it's Kerwood Corporation, a corporate entity that has the obligation to make the payments. And if you look at Oregon law, including Wampler, it says that anybody who's contracting with a corporate entity should reasonably expect that a corporate officer might induce a breach. Do any of those cases have a situation where that corporate officer was also, in his individual capacity, albeit with lesser personal obligations than the corporation, had signed the agreement? None of the Oregon cases address that issue. So here what we have, as counsel is arguing, is that there was a little more here. In fact, this wasn't some remote corporate officer of a publicly held or widely traded company. It's the same person, but he's got a corporate identity and he has an individual identity. And in this case, he actually signed for some individual obligations. And what you're saying, as I understand your argument, is that because he signed the contract as in an individual capacity, the reasonable expectations have to be limited and defined by what he expressly agreed to do or what they expressly agreed to do. That's right, Your Honor. And I think it's important in this case, if you look at the factual context, the reason that he signed the settlement agreement, if you look, is because he had been sued as a defendant in the patent infringement litigation. And so what he agreed to do was very limited. What he agreed to do was to release the claims that he had brought as counterclaims in the underlying patent infringement litigation. He agreed not to challenge the validity of the patents because he had done that in the underlying litigation. And he had also agreed to keep the terms of the agreement confidential. He didn't undertake any express obligations relating in any way to the license that was given by MIC or to the payment obligations. So it's a very different situation. And what the MIC was attempting to do here was to basically hold him personally accountable because care would breach. In a way, it's kind of a pierce the corporate veil. As you hear it kind of argued out, it seems like the real question is, did he, through any of his conduct, in effect give up his penumbra of corporate immunity? And that's absolutely why it's important to recognize that when he signed, quote, as a corporate officer, he was merely signing on behalf of the corporation. He didn't undertake any personal obligations. If the plaintiff in this case wanted to pursue Mr. Bailey personally for his conduct and how he controlled the corporation, they could have brought a claim for piercing the corporate veil if the evidence supported it. They did not do that. And if you look at the Wampler case as an example where, again, the attempt to hold an individual corporate officer liable for their conduct and how they controlled the corporation, Oregon law says that a party must expect, reasonably expect, that a corporate officer might induce a breach. And if that's the case, then at the time that MIC entered into this contract, as a matter of Oregon law, they had to expect that Mr. Bailey might, in certain circumstances, cause the corporation, Carewood, to breach. And they had every opportunity to protect themselves then. How would they have done that? They could have negotiated and bargained for a guarantee by Mr. Bailey and Vinod. They could have included a provision which obligated Mr. Bailey to control the corporation in a particular way. I mean, it's very common in business circumstances for a corporate officer to be held personally liable, or excuse me, for a party to negotiate for the corporate officer to guarantee the performance by the corporation. And that was not done here. And so this claim is basically an attempt to get what was never bargained for. Well, I don't think his argument isn't that they're a guarantor. It's just that it would have had to have been a guarantee, I suppose, that they would act in good faith to make sure the corporation adhered to its obligations, not as a guarantor. But that is basically the effect of what their theory is, because what they're basically saying is that when a corporate officer controls a corporation, they can be held liable on the contract for how they do so. And Oregon law says that you have to expect that an officer might control the corporation in a way that will induce a breach. And in this case- But with Wampler, I guess we're somewhere between Wampler and Pollack, because in Wampler, the corporate officer wasn't a party to the agreement. Is that correct? That's correct, Your Honor. Does that matter? In this circumstance, Your Honor, it doesn't. And if I can just briefly address the Pollack case, although it's obviously on short notice here. Right. In that case, we have very different circumstances. In that case, the plaintiff was negotiating directly with Horton, which was the corporate entity. And Horton obligated itself to create a subsidiary through which the operations would be conducted. And as part of that, the subsidiary, there was a profit-sharing arrangement, excuse me, in which Horton and Pollack shared profits that came out of the subsidiary. And basically, the theory there was that Horton had breached its obligations in plain view of good faith and fair dealing. But the obligations that Horton undertook in that case went well beyond what was undertaken here. There was no obligation here for Bailey and Vidot to create Carewood as a mechanism to purchase any kind of a business. The only reason that they signed the obligation in this case was because they had been sued as individual defendants, and all of their obligations relate directly to the claims that had been brought against them. Nothing related to the ongoing performance of the license agreement, which was also part of the settlement agreement in this case. Moving to the second issue, which Mr. Morris addressed, which is the $200,000 payment as damages. Your Honor, one of the questions, Judge Fischer, that you raised was, was there anything in the agreement which would lead one to believe or be evidence of the fact that the $200,000 payment was anything other than a royalty? We would submit that there is not. And if you look at the provision 12G of the agreement where there's a provision which states that if MIC fails to defend the patents, and I'm paraphrasing here, but basically, if MIC fails to defend the patents, then Carewood has the right to withhold the $200,000 payment. That's evidence of the party's intent that the $200,000 payment was part of the consideration for the ongoing license. Well, that doesn't make it a royalty, though, as such. It's not an earned royalty. It's a flat fee, isn't it, for the, in other words, which are payable upon use of the license, whereas this is, in effect, in their view, the payment that they're entitled to for you even to operate, whether you sell anything or not. Let me rephrase it. It's a minimum royalty. Regardless of sales, it's a minimum royalty. That's right. It is a royalty, but it's measured differently, Your Honor. Okay. I mean, it's an odd thing because it's in a paragraph about royalty payments if MIC fails to take appropriate action vis-a-vis the patent infringement, and then it follows on. It says, but only in the third year. So, in other words, if they don't follow paragraphs A and B, then you don't have to pay any royalties until they get their house in order under patent infringement, right? That's correct, Your Honor. But then it goes on to say, but in the third year, also, if they don't do paragraphs 12A and B, then you don't have to pay the $200,000. That's correct, Your Honor. So, it seems to me that it's not wholly a royalty-based payment. It may be just an ongoing business payment. In a sense, Your Honor, it's the only thing that was given really in exchange on an ongoing basis was the license that came to Kerwood. That was the only thing that was given in exchange on an ongoing basis. If you look, there's no admission here. In fact, there's a non-admission provision. There's no admission that there's any infringement. So, it can't be consideration for past infringement. It's got to be consideration for Kerwood's ongoing license and the patents. Well, as they characterize it, it's just consideration for the settlement of the disputed patent infringement. Would that change anything? Your Honor, I guess it's not clear to me. I guess the best evidence, I don't know if it would change it, Your Honor, because here I think the best evidence is that the intent of the parties was that it would be for the benefits that Kerwood would get by being licensed. And that evidence is found in paragraph 12. So, I don't know whether you characterize it specifically as a royalty. It's clear that the payments were only going to be made if there was such an ongoing business relationship and if MIC performed its duties as well. Well, let me just stop there. Sure. We have to separate out years one and two, which basically says pay up no particular contingency on years one and two. Although, I suppose if the agreement had been terminated prior to that time, and that's where the court ordered the second $200,000 paid. So, the first $400,000 is without contingency, correct? That's correct. Okay. So, the third installment of the $200,000 is the only one that's contingent on taking enforcement action in the patent arena, correct? That's correct, Your Honor. Okay. And your suggestion is that that is tied to your royalty simply because it's in the same paragraph or because it nets the same thing. In other words, if you don't have a secure patent position, then you're not going to have your same royalties. I guess I didn't follow the last part. My apologies, Your Honor. Yeah, why is it that you think the third $200,000 payment is a royalty-based payment? Well, Your Honor, for a couple reasons. One, the third payment is tied to enforcement of the patents, which is one of the benefits, obviously, that Kara would get from having a license. And if the patents are not enforced, which is one of the benefits of having the license in this case, then they're not obligated to make the payment. And that's precisely what a royalty is, which is a payment for getting the license. I think commonly royalties are sort of, as we were discussing earlier, payments that are made as sales are made. But they don't always have to be characterized that way. No, and there's lump sum royalty payments. Certainly. And in this case, the best evidence in the agreement, because of that paragraph and because of what was exchanged, is that this is, in fact, a royalty payment. And under Dow Chemical, if you look at the Dow Chemical case, it gives some guidance to this Court into how to characterize how a party can get their damages for this kind of a license agreement once it's terminated. And basically what would happen here if MIT was able to collect the future royalty payments after termination is they would both be able to exclude Kara Wood from operating or selling products which would be infringing, assuming that there was infringement. So they'd get the benefit of the government-sponsored monopoly of a patent, while at the same time being able to collect royalty payments from Kara Wood. So they'd get both the government-sponsored monopoly benefits and the benefits under the contract. And Oregon law and Dow Chemical both say that you have to make a choice. You either get to continue to allow the license to go forward and collect damages or you can terminate. Well, those cases are all lease cases, and they don't really track the facts in this case. So let's come back to the posture that you would have been in if they would not have sought to exclude your competition if you had paid royalties. In other words, if you had continued to operate under the contract, you would have been able to make use of their patent. All they're saying is that you can't go out there and hold yourself out as our licensee and get a free ride. So we're going to terminate that and hold you responsible at least for the payment that we made. And if you want to go pay the $200,000, then you're home free. So it's within your control, not their control. And that's correct, Your Honor. The first whether or not there's a breach is obviously within the corporation's control here, Kara Wood's control. And obviously, because of the record run summary judgment, the facts are going to be construed in the light most favorable to the plaintiff here. But Kara Wood withheld the payments. And assuming that there's a breach, which the court found here, then the plaintiff here has a contract right against Kara Wood for the payments that weren't made. So you can look to see what sales were made by Kara Wood, and they have a judgment for the royalties they would have collected during the time period when the license was in place. That's precisely what they bargained for in the contract, a contract right against Kara Wood, which if there was a breach, they'd be able to get a judgment to enforce. But once they terminated, on a going forward basis, if you look at Dow Chemical, their damages should be judged based on infringement. And if they had that decision at that point, they could have sued Kara Wood the next day for infringement if Kara Wood was still selling products that they believed were infringing patents. But they can't then also collect royalties under the agreement that they terminated. Well, it all depends on how one construes those $200,000 payments to the extent it created a regime where Kara Wood was in a preferred position for three years at $200,000 a pot. One has to construe those two sequential payments as segmentable. And I understand your argument on that. Thank you, Your Honors. Thank you. I think I can clear up a little bit of the confusion about this last issue. It really doesn't matter whether you call this $200,000 payment a royalty or a contract payment or consideration for the contract. The issue is whether the plaintiff can receive the benefit of the bargain. And when the defendant breaches the contract, the plaintiff is entitled to the damages that would have been expected under the contract. And I think where the confusion is, there probably are cases where in a patent license agreement or some other type of license agreement, once it's terminated, if there is a continuing sale under the license, that's really an infringement of the patent. And then you have to go for patent infringement damages. That is not the case here. There's no claim here that Kara Wood was still selling under the license after the termination date. The claim here is simply that the contract they breached called for a $200,000 payment, and had they not breached the contract, they would have made that payment. Well, that was my question. I don't think it matters what we call it. I think it matters how you construe G in paragraph 10. And whether it's a continuing, whether it's an obligation under this agreement, because it also does have a contingency under 12A and B. So does that change it in any way? There's a contingency on that third payment. Not on the first two, by the way, as you point out. I understand. But the contingency is simply a condition proceeding to the time of payment. But once the condition is met then, the payment is to be made. So has the condition been met? Yes. There was no claim about that. There was no claim that there was a condition that was not met. So it really doesn't matter how you characterize the payment. But I would point out that Bailey was sued in the original case, and he settled. And in the original case, the position was the patents were no good. And then they settled, and they said, give us a license under the patent. So there was a consideration for entering into the settlement agreement, whether you call it, like we say, damage is under the original case, or whether you just simply say it's part of the consideration for obtaining the license. Whatever it is, it was an expectation. The plaintiff should be able to receive it when there was a breach of the contract. So I really don't think these other cases are on point, because there is no claim of continuing infringement after the termination date. So what was the purpose? What was achieved by declaring the contract terminated then? Well, the Carolwood was out in the marketplace selling the product without paying the royalties. But then it is infringing. Up to the point, well, no, it wasn't infringement. It had a license to sell the product. Until the contract was terminated, it still had a license. So for all of that time, it was selling but not paying royalties and harming. We have a legitimate licensee who pays royalties. So these two companies are competing, and Carolwood's not paying royalties, so they're undercutting the company that is paying royalties. And it finally got to a point where it had to stop, and we terminated the license. But the damages owed are based on the contract up to that point. Thank you very much. The case of MSM Investments v. Carolwood is submitted. The next case for argument is Kelly v. Fleetwood. Thank you for watching.
judges: Goodwin, McKeown, Fisher